UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2012 MAY 30  P 4: 30

STATE OF CONNECTICUT      :
                          :
                          :  ss: Hartford, Connecticut
                          :
COUNTY OF HARTFORD        :

DISTRICT COURT
HARTFORD CT

3:12 mj 171 (DFm)

### AFFIDAVIT OF SPECIAL AGENT WILLIAM B. ALDENBERG

I, William B. Aldenberg, a Special Agent of the Federal Bureau of Investigation, New Haven Division, having been duly sworn, state:

**I.   INTRODUCTION**

1. I have been employed as a Special Agent with the Federal Bureau of Investigation ("FBI") since July 2002. While being trained as a Special Agent of the FBI, I have received training on how to investigate matters of public corruption, including attending the FBI's basic public corruption course at the FBI Academy located in Quantico, Virginia. Furthermore, I have assisted other FBI Agents on public corruption investigations, to include interviewing witnesses and suspects, and executing arrest warrants and search warrants.

2. Over the past nine years in federal law enforcement, I have been primarily assigned to investigations of violent criminal enterprises that participate in drug trafficking, firearms trafficking, and violent crimes. I have coordinated the controlled purchases of illegal drugs utilizing confidential sources, confidential human sources and undercover law enforcement officers, written, obtained and coordinated the execution of search and arrest warrants pertaining to individuals involved in illegal activities, conducted electronic as well as physical surveillance of individuals involved in illegal activities, analyzed records documenting the purchase and sale of illegal contraband, provided testimony both in Grand Jury proceedings and District Court proceedings, and spoken with informants, subjects and cooperating

defendants, as well as other local, state and Federal law enforcement officers, regarding the manner in which criminals distribute, obtain, finance, store, manufacture, transport, and distribute their illegal contraband. I have supervised the activities of informants who have provided information and assistance in connection with federal prosecutions. Since 2003, I have been the case agent, co-case agent, and/or Administrative Agent on seven Title III investigations targeting drug traffickers and their organizations. These investigations have led to the indictment, arrest, and conviction of over 250 defendants for violations of federal law. Furthermore, my involvement in Title III investigations includes being the Affiant on over 20 Title III affidavits requesting the interception of wire and/or electronic communications and/or the continued interception of such communications. I have also assisted other Agents with writing and reviewing Title III affidavits.

3. I am currently assigned to the FBI's Meriden Resident Agency and my primary responsibility is to investigate matters of public corruption. I am one of the co-case Agents that has directed the investigation that is the subject of this Affidavit. I have participated fully in this investigation and, as a result of this participation, as well as information provided by other law enforcement officers, I am thoroughly familiar with the information contained herein.

4. This Affidavit is submitted in support of a criminal complaint against ROBERT BRADDOCK, JR. ("BRADDOCK"). As described below, there is probable cause to believe and I do believe that BRADDOCK has unlawfully conspired and continues to unlawfully conspire to conceal financial contributions to the campaign of a candidate for the United States House of

Representatives, who is also a current member of the Connecticut General Assembly ("Public Official Number 1"),[1] all in violation of 2 U.S.C. § 441f and 18 U.S.C. § 371.

5. As a result of my personal participation in this investigation, I am familiar with the facts and circumstances of the offenses described in this Affidavit. Based on my training and experience set forth above, and the experience of other Agents participating in this investigation, I am also familiar with methods by which individuals seek to conceal their financial support for candidates seeking election to federal public office. Since this Affidavit is being submitted for the limited purpose of securing the issuance of the requested criminal complaint, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are sufficient to establish probable cause to believe that BRADDOCK has unlawfully conspired to conceal campaign contributions, in violation of 2 U.S.C. § 441f and 18 U.S.C. § 371.

## II. STATUTE

6. 2 U.S.C. § 441f provides, "No person shall make a contribution in the name of another person or knowingly permit his name to be used to effect such a contribution, and no person shall knowingly accept a contribution made by one person in the name of another person."

## III. FACTS & CIRCUMSTANCES SUPPORTING PROBABLE CAUSE

7. BRADDOCK is the Finance Director for Public Official Number 1's campaign for election to the United States House of Representatives (the "Campaign"). BRADDOCK is a

---

[1] With the exception BRADDOCK and Public Official Number 1, I will refer to co-conspirators with the designation ("CC"), followed by a number to identify the particular co-conspirator at issue. The identities of each of the co-conspirators described herein is known to me.

co-founder of a full-service political and non-profit fundraising firm. This investigation focuses, *inter alia*, on BRADDOCK's unlawful participation in a conspiracy to conceal campaign contributions. As described below, in furtherance of that conspiracy, BRADDOCK and others arranged for the Campaign to accept conduit contributions,[2] the purpose of which was to conceal the fact that the individuals who were actually financing the payments had an interest in legislation that was expected to and did come before the Connecticut General Assembly during the 2012 legislative session.

8. On April 3, 2012, the Connecticut General Assembly's Joint Committee on Finance, Revenue and Bonding (the "Finance Committee") voted in favor of a "Joint Favorable Substitute" revision to Senate Bill 357, an Act Concerning Various Statutes Related to the Department of Revenue Services. If enacted, Senate Bill 357 would have deemed Roll-Your-Own ("RYO") smoke shop owners to be tobacco manufacturers under Connecticut law, a designation that would have subjected RYO smoke shop owners to a substantial licensing fee and tax increase.[3] According to a series of recorded calls and meetings between CC-1 and others, the potential enactment of revised Senate Bill 357 (the "RYO Legislation") prompted CC-1, CC-2, BRADDOCK and other co-conspirators to arrange a payment of $10,000 to the Campaign, which consisted of four $2,500 checks in the names of conduit contributors. This

---

[2] The term "conduit contribution" is a contribution to a campaign that is made by one person in the name of another.

[3] RYO smoke shops sell loose tobacco and cigarette tubes, which are subject to tax, and provide customers with the option of paying a "rental" fee to use an RYO machine that can rapidly roll large volumes of cigarettes. Unlike cigarettes purchased over-the-counter, customers do not pay a tax on the RYO cigarettes when rolled by the RYO machines. Senate Bill 357 would have effectively closed this loophole by subjecting RYO smoke shop owners to the same licensing and tax regime governing tobacco manufacturers.

payment was then followed by another $10,000 payment, which consisted of three checks in the names of conduit contributors made payable to the Campaign, and one check in the name of a conduit contributor made payable to a political party.

9. On April 3, 2012, at approximately 4:43 p.m., Co-Conspirator No. 1 ("CC-1") placed a telephone call to an undercover FBI Special Agent, who was posing as an investor in RYO smoke shops ("UCE-1"). During the call, which was recorded,[4] CC-1 advised UCE-1 that he had scheduled a meeting with BRADDOCK and Co-Conspirator No. 3 ("CC-3"), who is an aide to the Campaign. The recorded conversation between CC-1 and UCE-1 proceeded as follows: CC-1: I already got it, it's all set up for next Wednesday. Already. UCE-1: Wednesday okay and, and uh. CC-1: Six to... UCE-1: You know we'll bump it from five to ten. CC-1: Yep. UCE-1: And uh that, that should hopefully you know get us, get us over that finish line. That's uh.... CC-1: Yep. UCE-1: That's, that's all we're looking for at this point. CC-1: That's it. According to UCE-1, who was debriefed following the above call, UCE-1 and CC-1 agreed that UCE-1 would provide CC-1 with $10,000 in cash so that CC-1 could recruit conduit contributors to make a $10,000 payment to the Campaign, which would be delivered to BRADDOCK and CC-3 at an upcoming meeting.

10. On April 4, 2012, CC-1 and UCE-1 met in Connecticut. The meeting was recorded using audio recording equipment. During the meeting, CC-1 and UCE-1 engaged in the following exchange: UCE-1 stated, "This is ten ($10,000) now for [Public Official Number 1]. ... It's too late in the game to fumble now. A little something in there for you...." CC-1 responded, "Alright." A few minutes later, CC-1 stated, "It's a game that lucky enough, I've got

---

[4] I have included in this Affidavit relevant transcripts of certain recorded telephone calls. Unintelligible portions of the conversations will be referenced using the abbreviation "UI."

the contacts to play good in it." According to UCE-1, who was debriefed following the above meeting, UCE-1 provided CC-1 with $11,000 in U.S. currency. Ten thousand dollars of that money was to be used by CC-1 to reimburse individuals who he had identified as willing to write a check to the Campaign in exchange for cash. The remaining one thousand dollars was provided to CC-1 as purported compensation for his coordination of the unlawful payment.

11.     On April 9, 2012, at approximately 4:00 p.m., CC-1 left the following recorded voicemail message for BRADDOCK : "Rob. [CC-1]. XXX-XXX-6519."

12.     On April 9, 2012, at approximately 4:36 p.m., CC-1 placed a recorded telephone call to BRADDOCK. The call proceeded as follows: BRADDOCK: This is Rob. CC-1: Hey Rob. It's [CC-1]. BRADDOCK: Hey [CC-1]. What's up man? CC-1: How you doin? [CC-3] talk about Wednesday? BRADDOCK: Ah nah. He's not in the office. I'm in a call time with [Public Official Number 1]. I haven't talked to [CC-3] lately. CC-1: Alright. Ah Wednesday. . . .. BRADDOCK: Why? What's up? CC-1: Wednesday I need you and him. Six o'clock to be . . . at [the restaurant]. I got ah, another ten grand for you. BRADDOCK: You're the f_cking man, man. I'll be there. CC-1: I figured you would. BRADDOCK: (laughing) Consider me there. CC-1: Yeah. What I need you to do. I emailed [CC-3]...I text [CC-3]. I need you to email me the contribution forms, so I can have everything filled out. BRADDOCK: Alright [UI]. Yep, don't worry about it. Gotcha. . . .

13.     On April 11, 2012, at approximately 6:30 p.m., BRADDOCK, CC-1, CC-3 and UCE-1 met at a restaurant in Southington, Connecticut. During a series of recorded calls prior to this meeting, CC-1 and Co-Conspirator No. 2 ("CC-2") discussed their efforts to recruit individuals to serve as conduit contributors in connection with the $10,000 payment to be delivered at the meeting. Prior to the meeting, CC-1 and UCE-1 met, and CC-1 provided UCE-1

with four $2,500 checks in the names of individuals whom CC-1 and CC-2 had recruited to serve as conduit contributors. The identities of the conduit contributors are known to this affiant. One of them is an associate of CC-1's, and three of them are associates of CC-2's. At the meeting, UCE-1 delivered to BRADDOCK and CC-3 four checks totaling $10,000, which were made out to the Campaign in the names of the conduit contributors. During the meeting, UCE-1 advised BRADDOCK and CC-3 that he (UCE-1) was not "on" any of the checks. Specifically, UCE-1 said, "I'm not on any of them. But if you think a more public showing from Roll-Your-Own then that's fine...I was just under the understanding that I thought it might be sensitive if we're out there... then that may be more of a red flag but I can switch that, right [CC-1]?.... and there are no duplicates in here from last time?," referring to the names that were used by CC-1 and others in December 2010 to make a payment to the Campaign. CC-1 responded, "No, no, no, I know how this works. Can't be duplicates..." Later in the conversation, UCE-1 said, "and even though my name is not on there, you know that it is me," referring to the fact that he (UCE-1) was actually financing the payment.

14.     On April 23, 2012, at approximately 4:40 p.m., CC-1 received a recorded telephone call from CC-3. The call proceeded as follows: CC-1: What's up [CC-3]? CC-3: Hey buddy. CC-1: What's goin' on? CC-3: Not much man. Hey, ah...one a the, ah, checks, ah, that we got from you the other day...last week... CC-1: Yuh. CC-3: ...ah, bounced. CC-1: What?! CC-3: Yeah. CC-1: Which one? CC-3: Uh, [name of conduit contributor]. CC-1: [name of conduit contributor]? CC-3: Yeah. (UI as the two speak over one another.) CC-1: Everybody was....everybody was given the cash to deposit. I'll make the call right now. CC-3: Alright man. CC-1: Alright, I'll get back to ya'. CC-3: W...we need...we need the check, ah, by

tomorrow at midnight. CC-1: Ah...well that...okay. I will do whatever I gotta' do, alright? CC-3: Okay, thanks... CC-1: Alright thanks, bye. CC-3: ... buddy.

15. Following the above call, CC-1 engaged in a series of recorded telephone calls with CC-2 in an effort to obtain a new check in the conduit contributor's name. Ultimately, CC-2 advised CC-1 that CC-2 would arrange to have a bank check for $2,500, along with $60 in cash to cover the bank charge associated with the bounced check, available at CC-2's place of business on the morning of April 24, 2012.

16. On April 24, 2012, CC-1 received a recorded telephone call from CC-3. During the call, CC-3 confirmed that one of his associates had retrieved the check from CC-2's place of business. CC-3 then thanked CC-1 for obtaining the new check.

17. In early May 2012, CC-1[5] engaged in a series of recorded telephone calls with CC-3, during which CC-1 advised CC-3 that he and UCE-1 were prepared to make an additional $10,000 payment, following the defeat of the RYO Legislation.

18. At midnight on May 9, 2012, the Connecticut General Assembly's legislative session ended. The RYO Legislation was not called for a vote by either chamber of the Connecticut General Assembly.

19. On May 14, 2012, CC-1 delivered to CC-3 another $10,000 payment to the Campaign in the form of three $2,500 conduit contributions made payable to the Campaign, and one $2,500 conduit contribution made payable to a political party. Following the delivery of those checks, CC-1 met with BRADDOCK and engaged, in part, in the following exchange: CC-

---

[5] On April 26, 2012, the FBI approached CC-1 and solicited his cooperation in connection with the investigation described herein. CC-1 agreed to cooperate proactively with the FBI, and, at the FBI's direction, proceeded to engage in a series of consensually recorded telephone calls and meetings with other subjects of this investigation, including BRADDOCK.

-8-

1: I just ran in. Thanked the man. BRADDOCK: Ok. CC-1: Uh, twenty thousand was well worth it. BRADDOCK: (laughs) Alright. CC-1: And, another ten grand just (UI). BRADDOCK: You're the man.

20. During May 15 and May 16, CC-1 and BRADDOCK engaged in a series of recorded telephone calls concerning the conduit contributors whose names appeared on the four checks delivered to CC-3 on May 14, 2012.

21. On May 15, 2012, at approximately 12:37 p.m., CC-1 placed a recorded telephone call to BRADDOCK, which is summarized, in part, as follows: BRADDOCK: This is Rob. CC-1: Rob, [CC-1]. BRADDOCK: Hey man. CC-1: [UI] Which checks again now? So I can [UI]. BRADDOCK: Yeah, I got one, ahmm, hang on. Because the other one is...[UI]... was it supposed to be four checks. I thought you told me it was ten ($10,000). I think we have three for a total of seventy five hundred. CC-1: [UI]... [CC-3] told me to write one out to the [political party]. BRADDOCK: Oh. Gotcha. Gotcha. Gotcha. Alright. Alright. Ahmm, I got the one from [name of conduit contributor] . . . CC-1: Yep. BRADDOCK: Then I got one .... [unknown female talking in the background]. Then I got two cashier's checks. One from American Eagle Federal Credit Union. It looks like the name is [name of conduit contributor]. CC-1: American Eagle Credit Union.... And that name is what? BRADDOCK: Hang on one second [BRADDOCK talking to female in background] ... I need to know who it is from. The bank manager signed it. But I need to know who it is from. It's from American Eagle Federal Credit Union. So whoever got that check and then the other one is from People's United Bank. It's a cashier's check as well. CC-1: People's United. Alright. You need the name, for that person. BRADDOCK: Yep, you got it. CC-1: Alright. And, and what are the check numbers so I [UI]. BRADDOCK: It's pretty long. CC-1: Yeah. BRADDOCK: The American Eagle check number

is 60880663. CC-1: Alright. BRADDOCK: And then the People's United Cashier's Check is 7389010. CC-1: Alright. You know how much fun it is dealing with these people, these people are so I need to get, you know, make sure I'm talking the right numbers and everything. Alright. BRADDOCK: I got yea. CC-1: I'll get back to ya as soon as I get the information. BRADDOCK: Thanks bud.

22. On May 15, 2012, at approximately 12:51 p.m., CC-1 placed a recorded telephone call to BRADDOCK, which is summarized as follows: BRADDOCK: Hey bud. CC-1: Hey. American Eagle. BRADDOCK: American Eagle. CC-1: [UI]... It's [name of conduit contributor]... BRADDOCK: [name of conduit contributor]. Got it. CC-1: Yep. And the other one is [name of conduit contributor].... BRADDOCK: [UI]... Do you know what towns they live in? CC-1: Both in Waterbury. BRADDOCK: Waterbury. Got it. Buddy. CC-1: Alright? BRADDOCK: Thanks, [UI], I appreciate it. CC-1: No problem.

23. On May 15, 2012, at approximately 1:05 p.m., CC-1 placed a recorded telephone call to BRADDOCK, which is summarized as follows: BRADDOCK: Hey [CC-1]. CC-1: Hey Rob. Just thinking about this. I don't know if you know the last time one of these a_shole drug addicts bounced a check even though we put the f_cking money right in their hand. BRADDOCK: Right. CC-1: Right... I want to make sure. I'm gonna stay on top of it. Give me the name of the other one. In the check, so I can stay on top of it. And make sure. BRADDOCK: I'm outside, I'm outside right now. You know what I will text it to you. CC-1: Alright. Because I don't want to ah look like an idiot in front of my, you know, my future congressman (referring to Public Official No. 1). BRADDOCK: No, I, I, understand. CC-1: [UI]. BRADDOCK: ...I was looking up. We got to do this reporting sh_t. I was looking up the [UI] [name of conduit contributor]. I can't find any, any, do you know anything out about the

guy. Does he own a business or? You know anything about him? [name of conduit contributor]? CC-1: Yea, that's [name of conduit contributor]... He's part owner of the... the cigarette place. BRADDOCK: Part owner of what? Cigarette [UI]. CC-1: You're breaking up. BRADDOCK: [UI]...anything like that.... You there. CC-1: Yeah.. You were breaking up. BRADDOCK: Can you hear me? CC-1: Yep, now I can.  The call was then terminated.

24.     On May 15, 2012, at approximately 1:08 p.m., CC-1 placed a call to BRADDOCK to finish the earlier conversation that had been disconnected. The call is summarized, in part, as follows:  BRADDOCK: If you've got like an address or anything for that guy. Cause I just got to put it in the report. I couldn't find anything on him. [name of conduit contributor]. CC-1: Alright. Let me find out. You need an address? BRADDOCK: Yep. CC-1: Alright. I'll get an address for you. And like I said. I want to keep on top of that other one.... You know because. The last time one of these as_holes bounced a check even though we put their money right in their hands. You know. You can't trust the drunks. BRADDOCK: [Laughter]. CC-1: You know. You know. Grabbing these drunks and drug addicts and saying, "here, write this check." People, they know. BRADDOCK: [Laughter]. CC-1: You know. So. BRADDOCK: [Laughter]. Oh, god. CC-1: You know. BRADDOCK: [UI]. CC-1: Like I said, you know, it was a very good investment for us to kill that bill. And they want to stay friends for a long time. So. You know. Alright. Let me see about getting that address for [name of conduit contributor], [UI] whatever. And then I'll give you a call back on that. And then hopefully you have that other ... be inside and give me the name of that other check. BRADDOCK: Ok. CC-1:  Alright. Call you back as soon as I got the other information. BRADDOCK: Yep.... man. [UI].

25. On May 15, 2012, at approximately 4:18 p.m., CC-1 engaged in a recorded telephone call with BRADDOCK. This telephone conversation is summarized as follows: CC-1: Loud sigh. BRADDOCK: Hey [CC-1], How's it going? CC-1: Hey Rob. Hey I just realized something. I was talking with CC-2 and that [name of conduit contributor] guy-- BRADDOCK: Yeah. CC-1: He is like one of the owners. BRADDOCK: Okay. CC-1: Alright. CC-1: You wanna tear that one up and I'll, I'll get another one? Or get that one back that's uh, that's a bank check so get that back, [UI]. BRADDOCK: I gotta, I gotta hang up with you right now, she's on her way to the f_cking bank to deposit it right now. CC-1: Oh, alright. BRADDOCK: Let me go, let me call, let me see if I can get her, I'll call you right back. CC-1: Oh, alright. BRADDOCK: Alright, bye.

26. Immediately following the above call, at approximately 4:18 p.m., BRADDOCK placed an outgoing telephone call to a telephone number subscribed to a female who is employed by the Campaign. Based on my training and experience and my participation in this investigation, I believe that BRADDOCK placed this call in order to advise the female employee not to deposit the check that BRADDOCK and CC-1 had just discussed.

27. At approximately 4:25 p.m., CC-1 engaged in a recorded telephone call with BRADDOCK. This telephone conversation is summarized as follows: BRADDOCK: Hey. CC-1: Hey. Sorry about that, there's just sometimes your hands are busy and you just cannot answer the phone if you know what I am I trying to say. [Both Laughing]. BRADDOCK: Sure. Alright man. Yeah. Well, we're all good. CC-1: Okay, uh, then I will uh, hook up, try to get another one for you, meet you tomorrow, sometime. BRADDOCK: Um hmm. Um hmm. Yeah. Sounds good. CC-1: Alright, so I'll get that one from you and do a switch. BRADDOCK:

Yeah, sounds good. CC-1: Alright, I'll call you sometime tomorrow when I get it done. BRADDOCK: Alright man. CC-1: Alright. BRADDOCK: Alright. I'll talk to you.

28. On May 16, 2012, at approximately 11:27 a.m., CC-1 engaged in a recorded telephone call with BRADDOCK. This conversation is summarized as follows: BRADDOCK: Hey [CC-1]. CC-1: Hey Rob, how ya doing? I'm on my way down, I'm on my way down to the [store], to pick it up. . . . BRADDOCK: Okay. Want me to have someone try to meet you there? Yeah. You want me to have someone try to meet you there? CC-1: Yeah. That'd be great if you could come down right there. That way, boom, boom, (UI) here's yours here's yours, here's mine you know. BRADDOCK: Okay, let me see, let me see if I can do that. Uh, I'll give you a call right back. CC-1: Alright. BRADDOCK: Bye.

29. On May 16, 2012, CC-1 and CC-3 met at a restaurant in Southington, Connecticut. At that meeting, CC-3 provided CC-1 with the check that BRADDOCK and CC-1 had agreed should be returned. In exchange, CC-1 provided CC-3 with another $2,500 check in the name of a different conduit contributor, who was not affiliated with the RYO smoke shops.

## IV.  CONCLUSION

30. Based on the foregoing, I respectfully submit that there is probable cause to believe and I do believe that BRADDOCK has conspired and continues to conspire with others to unlawfully conceal campaign contributions to the campaign of Public Official Number 1, in violation of 2 U.S.C. § 441f and 18 U.S.C. § 371. I, therefore, respectfully request that the Court issue the attached criminal complaint, charging BRADDOCK with unlawfully conspiring to

conceal campaign contributions, in violation of 2 U.S.C. § 441f and 18 U.S.C. § 371.

William B. Aldenberg
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this 30th day of May 2012, at Hartford, Connecticut.

/s/ Donna F. Martinez, USMJ

HONORABLE DONNA F. MARTINEZ
UNITED STATES MAGISTRATE JUDGE